# UNITED STATES DISTRICT COURT
JUDGE NATHAN SOUTHERN DISTRICT OF NEW YORK

## 12 CV 3170

|  |  |  |
|---|---|---|
| BP ARGENTINA EXPLORATION COMPANY and BP ALTERNATIVE ENERGY NORTH AMERICA INC., | : : : | |
| Plaintiffs, | : : | No. 12 Civ. _____ ( ) |
| v. | : : | **COMPLAINT** |
| BRIDAS CORPORATION and BRIDAS INVESTMENTS LTD., | : : : | |
| Defendants. | : : : | |

Plaintiffs BP Argentina Exploration Company and BP Alternative Energy North America Inc. (collectively, "BP Parties"), by their undersigned counsel, for their Complaint against defendants Bridas Corporation ("Bridas") and Bridas Investments Ltd. (collectively, "Bridas Parties"), allege on knowledge as to themselves and upon information and belief as to all other matters as follows:

## OVERVIEW OF ACTION

1.    By this action, the BP Parties seek a declaratory judgment declaring valid and legally binding two agreements between the BP Parties and Bridas Parties:   (i) the Share Purchase Agreement, dated November 28, 2010 ("Share Purchase Agreement"), including the AMI Waiver and Release (as described and defined below) provided for therein; and (ii) the Settlement Agreement and Mutual Release, also dated November 28, 2010 (the "Settlement Agreement"), including the Settlement Agreement Release (as described and defined below) provided for therein.

2.      The BP Parties, two affiliates of BP p.l.c. ("BP"), own 60% of the shares of Pan American Energy LLC ("PAE"), a Delaware limited liability company engaged in the exploration and production of oil and natural gas and governed by the Second Amended and Restated Limited Liability Company Agreement of Pan American Energy LLC ("LLC Agreement"). The Bridas Parties own 40% of the shares of PAE.

3.      On November 28, 2010, the parties entered into the Share Purchase Agreement, pursuant to which the BP Parties agreed to sell their shares of PAE to Bridas for $7,059,250,000. On November 27 and 28, 2010, the parties also entered into several other related agreements, including the Settlement Agreement.

4.      The Share Purchase Agreement and Settlement Agreement provide that if the Share Purchase Agreement is terminated and the BP Parties pay Bridas an additional $700 million after termination, the BP Parties are entitled to (i) a release from certain restrictions in the LLC Agreement with respect to their interests or participation in competitive business in a geographic region defined as the "Area of Mutual Interest" (the "AMI Waiver and Release"), and (ii) a broad release of all claims against them and their affiliates arising out of or related to certain disputed matters (the "Settlement Agreement Release").[1]  The AMI Waiver and Release and the Settlement Agreement Release are referred to herein as the "Releases."

5.      On November 5, 2011, Bridas elected to terminate the Share Purchase Agreement. Accordingly, on November 10, 2011, as required by the Share Purchase Agreement, the BP Parties wired Bridas $700 million to an account previously identified by Bridas.   And on

---

[1] Under the terms of the Settlement Agreement, Bridas obtained a release upon termination of the Share Purchase Agreement.

November 14, 2011, again as required by the Share Purchase Agreement, the BP Parties refunded to Bridas the full amount that Bridas had previously paid to the BP Parties for their shares of PAE ($3,529,625,000).

6.      On November 17, 2011, without notice, Bridas transferred $700 million back to the BP Parties.  That same day, Bridas sent a letter to BP stating that "because we consider the Share Purchase Agreement dated November 28, 2011 and all other Transaction Documents null and void ab initio, Bridas Corporation is transferring back the amount of US$ 700,000,000 that was transferred to us on November 10, 2011."

7.      On April 13, 2012, Bridas sent a letter to the BP Parties stating: "Following the termination of the November 2010 transaction on November 2011, you transferred to Bridas a total of $700 million; amount that was returned by Bridas considering '*the Share Purchase Agreement dated November 28, 2010 and all the other Transaction Documents null and void ab initio*.' . . . Without prejudice to any of Bridas' legal rights or positions, please transfer the $700 million . . . to the following account." (emphasis in original).  Thus, Bridas has requested the payment of $700 million without prejudice to its ability to continue to assert that the Share Purchase Agreement, Settlement Agreement and Releases are *void ab initio*.

8.      On April 17, 2012, Bridas sent a letter to the BP Parties requesting payment of the $700 million on April 18, 2012 or an explanation of why the BP Parties did not yet transfer back the $700 million.

9.      On April 19, 2012, the BP Parties sent a letter to Bridas confirming that they are willing to pay Bridas the requested $700 million as long as Bridas acknowledges the validity of the Share Purchase Agreement, Settlement Agreement and Releases.  Specifically, the letter

stated: "[W]e remain ready to pay promptly to Bridas the requested $700 million provided that you acknowledge and accept in writing the continuing effectiveness of the SPA, including the AMI Waiver and Release, and of the Settlement Release.  In light of your previous statements, in the absence of such acknowledgment, we see no alternative to holding this $700 million for the benefit of Bridas until such issues are resolved.  After receipt of your signed acknowledgment and agreement below, we will promptly re-wire the money as requested."

10.     On April 19, 2012, Bridas sent a letter to BP, responding to the BP Parties' letter of the same date and demanding again that the BP Parties transfer $700 million to Bridas.  In its April 19, 2012 letter, Bridas did not acknowledge the validity of the Share Purchase Agreement, Settlement Agreement and Releases.

11.     Based on the November 17, 2011, April 13, 2012 and April 19, 2012 Bridas letters, it is obvious that there is a ripe and actual controversy over the validity of the Share Purchase Agreement, Settlement Agreement and Releases and the BP Parties have no choice but to seek a declaratory judgment from this Court.

12.     The BP Parties have fulfilled all of their obligations under the Share Purchase Agreement and other agreements entered into on November 27 and 28, 2010.  Since receiving the money back from Bridas, the BP Parties have held the previously wired $700 million for the benefit of Bridas and have offered to pay the $700 million to Bridas for the second time.  The BP Parties have been and remain willing to pay Bridas if either Bridas acknowledges the validity of the Share Purchase Agreement, Settlement Agreement and Releases or the Court orders that the Share Purchase Agreement, Settlement Agreement and Releases are valid and effective.  By demanding payment under the Share Purchase Agreement, yet refusing to acknowledge the

validity of the Share Purchase Agreement, Settlement Agreement and Releases, and continuing to take the position that the very agreements under which it is seeking the payment are *void ab initio* premised on a baseless claim of fraud, Bridas is seeking to have it both ways. As explained below, Bridas's demand for the $700 million can only be based on the terms of the Share Purchase Agreement and the Settlement Agreement pursuant to which the BP Parties would pay Bridas the $700 million upon termination of the Share Purchase Agreement in return for the Releases. Bridas's current position that it is entitled to the payment of the $700 million has no merit if the Share Purchase Agreement, Settlement Agreement and Releases are *void ab initio* as Bridas maintains. Moreover, as explained below, Bridas's claim of fraud is legally untenable.

13.     The BP Parties believe that the Share Purchase Agreement, Settlement Agreement and Releases are valid and effective and are not *void ab initio*. However, given Bridas's current position, which is completely illogical, the BP Parties see no alternative to resolve this issue other than to seek a declaration from this Court that the Share Purchase Agreement, the Settlement Agreement, and the Releases are valid and effective. The BP Parties remain ready to transfer back to Bridas the $700 million they are holding for the benefit of Bridas if Bridas acknowledges the validity of the Share Purchase Agreement, the Settlement Agreement and the Releases, or this Court determines that the Share Purchase Agreement, the Settlement Agreement and the Releases are valid and effective. On the other hand, should this Court determine that the Share Purchase Agreement, Settlement Agreement and Releases are not valid and effective, then Bridas is not entitled to the $700 million as it is only pursuant to the terms of the Share Purchase Agreement that it can demand this amount from the BP Parties.

14.     Accordingly, the BP Parties seek a judgment declaring that the Share Purchase Agreement, Settlement Agreement and Releases are valid and legally binding.

### THE PARTIES

15.     Plaintiff BP Argentina Exploration Company ("BPAEC") is a corporation organized under the laws of Delaware and having its principal place of business at 501 Westlake Park Boulevard, Houston, Texas 77079.

16.     Plaintiff BP Alternative Energy North America Inc. is a corporation organized under the laws of Delaware and having its principal place of business at 501 Westlake Park Boulevard, Houston, Texas 77079.

17.     Upon information and belief, defendant Bridas Corporation is a foreign corporation organized under the laws of the British Virgin Islands and having its principal place of business in Buenos Aires, Argentina.

18.     Upon information and belief, defendant Bridas Investments Ltd. ("BIL") is a foreign corporation organized under the laws of the British Virgin Islands and having its principal place of business in Buenos Aires, Argentina.  BIL is a wholly owned subsidiary of Bridas.

### JURISDICTION

19.     Jurisdiction is proper under 28 U.S.C. § 1332(a)(2) because complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.  As consideration for the rights the BP Parties are seeking to enforce, the BP Parties agreed to pay—and did pay—$700 million.

20.     This Court has personal jurisdiction over Bridas because, among other reasons, Bridas expressly agreed to submit to the jurisdiction of any state or federal court located in New York, New York in (i) Section 12.18 of the LLC Agreement, (ii) Section 10.7 of the Share Purchase Agreement, and (iii) Section 12(A) of the Settlement Agreement.

21.     This Court has personal jurisdiction over BIL because, among other reasons, BIL expressly agreed to submit to the jurisdiction of any state or federal court located in New York, New York in (i) Section 12.18 of the LLC Agreement and (ii) Section 12(A) of the Settlement Agreement.

22.     Venue is proper in this District under 28 U.S.C. § 1391(d) because (i) the Bridas Parties are foreign corporations, (ii) a substantial part of the events giving rise to the claim at issue occurred in this District, (iii) the Bridas Parties are subject to personal jurisdiction in this District, (iv) the Bridas Parties agreed in Section 12.18 of the LLC Agreement and Section 12(A) of the Settlement Agreement that any action arising out of or relating to those agreements may be heard in any federal or state court located in New York, New York, and (v) the Bridas Parties appointed CT Corporation, located in New York, New York, as their agent to receive service of process in Section 12(C) of the Settlement Agreement.  In addition, Bridas agreed in Section 10.7 of the Share Purchase Agreement that any action arising out of or relating to the Share Purchase Agreement may be heard in any federal or state court located in New York, New York, and Bridas appointed CT Corporation, located in New York, New York, as its agent to receive service of process in Section 10.7(c) of the Share Purchase Agreement.

## FACTUAL BACKGROUND

### Formation of PAE and the LLC Agreement

23.     In 1997, predecessors of the BP Parties—Amoco Argentina Oil Company and Amoco Power Resources Corporation—entered into various agreements with the Bridas Parties, including the original version of the LLC Agreement, pursuant to which PAE, a new Delaware limited liability company, was formed and is governed.  PAE is primarily engaged in the business of exploration, development and transportation of oil, natural gas and other hydrocarbons in a specified geographic region (sometimes referred to as the "Southern Cone") of South America.

24.     The LLC Agreement provides that the members' interests in PAE are represented by 10,000 shares ("PAE Shares").  The BP Parties own 60% of those shares (6,000 shares), and the Bridas Parties own 40% (4,000 shares).  (Collectively, the BP Parties and Bridas Parties are referred to in the LLC Agreement and herein as the "Members.")  The PAE Shares are not publicly traded and no other entity owns any PAE Shares.

25.     Sections 10.1 and 10.2 of the LLC Agreement imposed certain restrictions on the Members and their Related Parties (as defined in the agreement) with respect to their interests or participation in "Competitive Business."  As defined in the agreement, these restrictions applied to the exploration, development and transportation of oil, natural gas and other hydrocarbons in an "Area of Mutual Interest" or "AMI" that encompasses the Southern Cone of South America and certain offshore waters.  Stated simply, these provisions of the LLC Agreement provided, among other things, that if a Member or any of its Related Parties proposed to acquire an interest

or engage in a Competitive Business in the AMI, the Member must first offer that Competitive

Business opportunity to PAE.

### The Parties Negotiate and Enter Into the
### Share Purchase Agreement and Related Agreements

26.      In the summer of 2010, the BP Parties and Bridas began to discuss a possible sale

of the BP Parties' PAE Shares to Bridas.  The terms of the share purchase were negotiated in,

among other places, New York, New York.

27.      In negotiating the Share Purchase Agreement, the parties recognized that Bridas

had been a Member of PAE since its formation in 1997 and thus did not require any due

diligence of PAE before purchasing the BP Parties' PAE Shares.  In fact, Bridas expressly

acknowledged in the Share Purchase Agreement that it possessed "a current and full

understanding of the business and affairs" of PAE and that it "has not requested to make any

additional assessment, due diligence or other investigation into the business and affairs of the

Company and the Acquired Subsidiaries, and does not require and is not seeking from the Sellers

any information whatsoever in respect of the Company or the Acquired Subsidiaries."

28.      The BP Parties also did not make—and thus Bridas could not have relied on—any

representations or warranties about PAE.  Indeed, Section 3.1A of the Share Purchase Agreement

expressly states that (i) the BP Parties and their affiliates were not making "any written or oral

representation or warranty" about PAE, (ii) the BP Parties "expressly disclaim[ed] any

representation or warranty, express or implied in law, equity, or otherwise, as to any matter,"

(iii) Bridas "specifically disclaim[ed] that it is relying on or has relied on any such representation

or warranty, as an inducement to enter into" the Share Purchase Agreement, (iv) "it [is] expressly

understood and agreed by the Parties that [Bridas] is purchasing the [BP Parties' PAE] Shares

and an interest in [PAE and its subsidiaries] in their present status, condition and state of repair with all faults or defects (known or unknown, latent, discoverable or undiscoverable) including any matter or circumstance relating to any and all actions, suits, demands, claims, hearings, arbitrations, investigations or similar proceedings, whether pending, threatened or otherwise; any matter or circumstance relating to compliance with Law," and (v) BP and its affiliates shall not have any "[l]iability or indemnification obligation in respect of, any written or oral representation or warranty, express or implied."   In addition, Section 6 of the Settlement Agreement provides that "[e]xcept as expressly provided herein, the Parties acknowledge and agree that no Party, nor any of its respective affiliates, related parties, officers, directors, agents or employees, is making or has made, and that none of them shall have any liability or indemnification obligation in respect of, any written or oral representation or warranty, express or implied, at law, in equity or otherwise, and specifically disclaim that they are relying on or have relied on any such representation or warranty, as an inducement to enter into this Agreement or otherwise."

29.     On November 27 and 28, 2010, the BP Parties and Bridas entered into the Share Purchase Agreement and several other related agreements, including the Settlement Agreement. Under the terms of the Share Purchase Agreement, the BP Parties agreed to sell their 6,000 PAE Shares to Bridas for a total purchase price of $7,059,250,000.

30.     Section 2.2 of the Share Purchase Agreement required Bridas to pay the purchase price to the BP Parties in the following three installments:   "(a) US$1,411,850,000 shall be payable on December 3, 2010, (b) US$2,117,775,000 shall be payable on December 28, 2010, and (c) US$3,529,625,000 (plus the amount, if any, previously paid by Sellers to Buyer under

Sections 8.2(d)(i)(y) and 8.2(e)) shall be payable on Closing." The Share Purchase Agreement required the BP Parties to deliver their PAE Shares to Bridas in specified amounts upon receipt of the first two payments set forth in (a) and (b) above. Section 2.6 of the Share Purchase Agreement defined "Closing" as a date three business days after satisfaction or waiver of all conditions to the obligations of the BP Parties and Bridas to consummate the transaction.

31.    On November 28, 2010, the BP Parties and Bridas entered into a letter agreement providing that a condition to the consummation of the Closing was that Bridas obtain certain governmental approvals of the transaction. Specifically, Bridas was required to obtain (i) the approval of the PRC National Development Reform Commission for the transaction, the evidence of which would be a letter from CNOOC International Ltd. confirming the receipt of such approval and (ii) the receipt of a letter from Argentina's Comision Nacional de Defensa de la Competencia ("CNDC") approving, or confirming that CNDC has no objections to, the transaction. The parties agreed that they would make a joint submission to the CNDC.

32.    Bridas paid the first two installments (a total of $3,529,625,000.00) on the dates specified in the Share Purchase Agreement, and the BP Parties delivered their PAE Shares to Bridas as required by that same agreement.

33.    The AMI Waiver and Release is set forth in Section 6.8(a) of the Share Purchase Agreement. That provision states that the provisions of Sections 10.1 and 10.2 of the LLC Agreement applicable to the BP Parties, the Bridas Parties and their respective Related Parties with respect to Competitive Business in the Area of Mutual Interest are waived, effective retroactively as of January 1, 2010. Section 6.8(a) further provides that (i) the AMI Waiver and Release would become unconditional and irrevocable upon Closing or, (ii) if the Share Purchase

-11-

Agreement was terminated pursuant to Section 8.1 of that agreement and the BP Parties paid $400,000,000 to Bridas pursuant to Section 8.2(e) ("AMI Fee"), the AMI Waiver and Release would continue unconditionally and irrevocably thereafter with respect to BP and its Related Parties and Bridas and its Related Parties. Thus, the Share Purchase Agreement provides that if the AMI Fee pursuant to Section 8.2(e) was made, the AMI Waiver and Release would survive the termination of the Share Purchase Agreement.[2]

34.    Section 8.1 of the Share Purchase Agreement sets forth conditions that would give rise to rights to terminate the contract. Section 8.1(e) gave the parties a contractual right to terminate the agreement by notice in writing after the passage of the "Longstop Date" if the Closing had not yet occurred. The Longstop Date specified in the Share Purchase Agreement was originally March 28, 2011, but each party had a one-time right to "extend the Longstop Date for an additional 120 days" by providing notice in writing three business days prior to the original Longstop Date of March 28, 2011.

35.    Section 8.2(d) of the Share Purchase Agreement provides that if either the BP Parties or Bridas exercised their termination rights pursuant to Section 8.1, the BP Parties were required to pay to Bridas within five business days of termination (i) an amount equal to that

---

[2] Pursuant to Section 8.2(a) of the Share Purchase Agreement, in addition to the Parties' obligations under Sections 6.8(a) regarding the AMI Waiver and Release, the Parties' obligations under the following provisions of the Share Purchase Agreement also do not terminate upon the termination of the Share Purchase Agreement: (i) Section 2.4(b) (the Parties' rights to nominate Managers and senior management and PAE's obligation to indemnify Managers and certain employees); (ii) Section 5.6 (Bridas's obligation to indemnify the BP Parties); (iii) Section 6.4 (confidentiality); (iv) Section 6.8(b) (conflicts between Section 6.8(a) of the Share Purchase Agreement and Sections 10.1 and 10.2 of the LLC Agreement); (v) Section 6.10 (Devon Properties); (vi) Article 8 (termination of Share Purchase Agreement, including requirement to pay termination fee); (vii) Section 9.10 (no consequential damages); and (viii) Article 10 (miscellaneous provisions).

portion of the purchase price that had been paid by Bridas, and (ii) an additional amount of $300,000,000 as a termination fee ("Termination Fee").

36.     In addition, if either the BP Parties or Bridas exercised their termination rights pursuant to Section 8.1, Section 8.2(e) of the Share Purchase Agreement further provides that as consideration for the AMI Waiver and Release, BPAEC was required to pay Bridas within five business days of termination the AMI Fee, an additional $400,000,000.

37.     Section 1(B) of the Settlement Agreement provides that, upon payment of the Termination Fee required by Section 8.2(d)(i)(y) of the Share Purchase Agreement and payment of the AMI Fee required by Section 8.2(e) of the Share Purchase Agreement, the BP Parties and other related entities would be unconditionally and irrevocably released from any of the Bridas Parties' (and others') claims or defenses, whether known or unknown, arising out of or related to "Disputed Matters" (as defined in the agreement).  Section 1(A) of the Settlement Agreement provides that, upon termination of the Share Purchase Agreement, the BP Parties would release the Bridas Parties from a comparable set of claims.

38.     The Share Purchase Agreement and Settlement Agreement further provide that rescission is not an available remedy.   Specifically, Section 10.6 of the Share Purchase Agreement provides that "[e]xcept in accordance with Section 8, rescission of the transactions under this Agreement or similar remedies (collectively, the '*Rescission Remedies*') shall not be available to any Party and the Parties expressly waive any right under law or equity to such Rescission Remedies."   (emphasis in original).   Similarly, Section 10 of the Settlement Agreement states that "[n]otwithstanding anything to the contrary contained herein, in no event shall rescission of this Agreement or similar remedies be available to any Party and the Parties

-13-

expressly waive any right under law or equity to such remedies." In addition, Section 9 of the Settlement Agreement provides that "[i]f any Party to this Agreement, and/or any of the BP Entities and Bridas Entities, should later discover that any fact they relied upon in entering this Agreement is not true, or that their understanding of the facts or law was incorrect, they shall not be entitled to terminate, or seek rescission of, this Agreement, or otherwise attack the validity of this Agreement, based on any such mistake."

39.    Bridas admits that it learned on December 21, 2010 of facts (the "Information") which BP did not disclose to Bridas prior to the signing of the Share Purchase Agreement. Bridas incorrectly, and without basis, claims that the non-disclosure of the Information results in the Share Purchase Agreement and Releases being *void ab initio*.

### Bridas Continued to Exercise its Rights and to Perform Certain of its Obligations Under the Share Purchase Agreement and Related Agreements

40.    After Bridas learned of the Information, on December 28, 2010, Bridas nonetheless made the second payment of $2,117,775,000 due to the BP Parties under the Share Purchase Agreement.

41.    Bridas thereafter repeatedly exercised its rights and performed certain of its obligations under the Share Purchase Agreement and related agreements. For example, after Bridas made the first payment on December 3, 2010, Bridas availed itself of its contractual right to control PAE under the Share Purchase Agreement and First Amendment to the LLC Agreement, also dated November 28, 2010 ("First Amendment"). Pursuant to Section 2.4(b) of the Share Purchase Agreement, Bridas appointed (i) additional Managers to PAE's Management Committee that functions as PAE's board of directors, and (ii) PAE's Chief Executive Officer and Chief Financial Officer. These positions previously had been filled by persons nominated by

the BP Parties.  As a result of these appointments, all Managers of PAE and its most senior executives were individuals nominated by Bridas.  If the Share Purchase Agreement in Bridas's view was *void ab initio*, Bridas nominees should not have continued to hold the additional positions described in this paragraph past December 21, 2010.  However, the individuals appointed by Bridas continued in these positions until November 2011.

42.     Long after Bridas learned of the Information, Bridas and the BP Parties made joint submissions to the CNDC seeking necessary governmental approval of the transaction on December 28, 2010, February 16, 2011, February 21, 2011, March 17, 2011, May 20, 2011 and July 20, 2011.

43.     On March 17, 2011, Bridas exercised its one-time right to extend the Longstop Date by sending BP a notice that extended the Longstop Date from March 28, 2011 to July 26, 2011.  This extension of the Longstop Date can only be interpreted as Bridas expressing through its actions that it understood the Share Purchase Agreement to be in full force and effect despite its knowledge of the Information, which Bridas has months later claimed voided the Share Purchase Agreement *ab initio*.

44.     Despite the fact that Bridas had known of the Information since December 21 of the prior year, in a letter to BP's CEO dated July 7, 2011, Bridas's President and Chairman, Carlos Bulgheroni, asserted that "Bridas has been doing everything possible together with BP to obtain the necessary approvals from the CNDC to close this transaction."  Mr. Bulgheroni continued to state in discussions with BP and its representatives in July and August 2011 that Bridas was doing everything possible to obtain the necessary approvals to close the transaction.

45.     Bridas continued to take full advantage of the terms of the Share Purchase Agreement and related contracts.  On July 21, 2011, the BP Parties and Bridas entered into an agreement to extend the Longstop Date once again—this time, from July 26, 2011 to November 1, 2011.  The purpose of this extension was to give Bridas additional time to seek and obtain the governmental approvals necessary to close the transaction, as Bridas was required to do under the Share Purchase Agreement and related agreements.  Thus, Bridas once again reaffirmed the continued viability of the Share Purchase Agreement.

46.     Over two months after agreeing on the second extension of the Longstop Date and 9 months after learning of the Information, in a letter sent to BP's CEO dated September 29, 2011, Mr. Bulgheroni claimed for the first time that the Share Purchase Agreement was "null and void ab initio" because of BP's alleged "fraud and other misconduct."  In another letter to BP's CEO two days later, Mr. Bulgheroni withdrew the September 29, 2011 letter because "we are currently engaged in productive discussions directed to finding a way forward," while reserving the right to reassert the positions stated in the earlier letter.

47.     The parties thereafter continued to discuss another possible extension of the Longstop Date and/or amendments to the Share Purchase Agreement.  In view of those discussions, Bridas requested that the parties enter into a Standstill Agreement, which they did on October 21, 2011.  In that agreement, the BP Parties and Bridas agreed on behalf of themselves and their respective affiliates that "they will not contend that the passage of time after September 1, 2011 or any conduct after September 1, 2011 constitutes or supports a defense of ratification of the Share Purchase Agreement (including the AMI Waiver and Release),

Settlement Agreement and related agreements or constitutes a waiver of any potential claims, counterclaims and defenses that may have existed as of September 1, 2011."

### Bridas Terminates the Share Purchase Agreement

48.     By letter to the BP Parties dated November 5, 2011, Bridas exercised its termination rights under Section 8.1(e) of the Share Purchase Agreement, terminated the Share Purchase Agreement as of that date, and provided bank account details for receipt of payments from the BP Parties pursuant to the Share Purchase Agreement.  The letter stated:  "Please transfer no later than five (5) Business Days from the date hereof the funds referred to in Section 8.2(d) of the Agreement [which included both the payments made by Bridas to date as well as the $300,000,000 Termination Fee] in cash and by wire transfer of immediately available funds to the following [specified] bank account."

49.     On November 10, 2011, the fourth business day following termination, the BP Parties paid $700,000,000 in cash to Bridas by wire transfer of immediately available funds in full satisfaction of the BP Parties' obligations to pay the Termination Fee ($300,000,000) and AMI Fee ($400,000,000) pursuant to Sections 8.2(d) and Section 8.2(e) of the Share Purchase Agreement.  In wiring these funds to the account specified in Bridas's letter of November 5, 2011, the BP Parties fully satisfied the conditions precedent necessary for (i) the AMI Waiver and Release to continue thereafter, and (ii) the Settlement Agreement Release to take effect.

50.     On November 14, 2011, the fifth business day following termination, representatives of the BP Parties met with representatives of Bridas at the offices of Herbert Smith LLP in Hong Kong.  In accordance with the terms of Section 8.2(d) of the Share Purchase Agreement, the BP Parties paid Bridas the amount of the purchase price that had been paid by

-17-

Bridas to date ($3,529,625,000).   In exchange, Bridas returned the PAE Shares that the BP Parties previously had delivered to Bridas.

51.    On November 17, 2011, without any notice or previous discussion, Bridas transferred $700 million back to the BP Parties.  On that same day, Mr. Bulgheroni sent a letter to BP International Ltd. ("BP International") on behalf of Bridas stating:  "This letter is to inform you that, because we consider the Share Purchase Agreement dated November 28, 2011 and all the other Transaction Documents null and void ab initio, Bridas Corporation is transferring back the amount of US$ 700,000,000 that was transferred to us on November 10, 2011.  The transfer is being sent to the same account from which we received such amount."

52.    BP International responded to Mr. Bulgheroni's November 17, 2011 letter the next day as follows:  "Referring to your letter of 17 November 2011, we are confident that the Share Purchase Agreement and related documents are valid and enforceable.  Rather than engage in back-and-forth wire transfers, for the time being we will hold the $700 million to Bridas' account and order in fulfillment of our obligations under the SPA."

53.    On April 13, 2012, Mr. Bulgheroni sent the letter to the BP Parties on behalf of Bridas, described in greater detail in paragraph 7, above, demanding that the BP Parties transfer the $700 million to Bridas, "[w]ithout prejudice to any of Bridas' legal rights or positions." Bridas's April 13, 2012 letter also provided wiring instructions for the payment.

54.    On April 17, 2012, Bridas sent a letter to the BP Parties stating:  "As of today, we have not received the transfer of $700 million.  We would appreciate to receive the transfer tomorrow or an explanation of why you failed to do that."

55.    On April 19, 2012, the BP Parties sent a letter to Bridas reiterating that they are willing to pay Bridas the requested $700 million provided that Bridas acknowledges the effectiveness of the Share Purchase Agreement and Releases.

56.    On the evening of April 19, 2012, Mr. Bulgheroni sent a letter to BP's CEO again demanding that the BP Parties transfer $700 million to Bridas.  In the letter, Bridas does not acknowledge the validity of the Share Purchase Agreement, Settlement Agreement and Releases.

### Bridas's Frivolous Fraud Claim

57.    Notwithstanding its conduct for much of the last year and its demand for the $700 million payment, Bridas apparently continues to take the position that it was fraudulently induced to enter into the Share Purchase Agreement and related contracts.  That claim is frivolous for multiple reasons, including at least the following.

58.    First, Bridas acknowledged in the Share Purchase Agreement that it possessed "a current and full understanding of the business and affairs" of PAE and that it "has not requested to make any additional assessment, due diligence or other investigation into the business and affairs of the Company and the Acquired Subsidiaries, and *does not require and is not seeking from the Sellers any information whatsoever in respect of the Company or the Acquired Subsidiaries*" (emphasis added).  And Bridas chose not to obtain any relevant contractual representations or warranties from the BP Parties in negotiating the Share Purchase Agreement.

59.    Second, the Share Purchase Agreement, including the provisions relating to the AMI Waiver and Release, and Settlement Agreement specifically provide that rescission is not an available remedy.  Yet Bridas seeks to rescind these agreements nearly a year after the parties agreed to them.

60.     Third, Bridas in the Settlement Agreement released any claim of fraud relating in any way to PAE or the LLC Agreement.

61.     Fourth, after learning the Information on December 21, 2010, Bridas did not assert any claim of fraud for more than 8 months.   Bridas instead repeatedly ratified the transaction and the Share Purchase Agreement, the Settlement Agreement and the Releases by, among other things, (i) making the second payment pursuant to the Share Purchase Agreement on December 28, 2010, (ii) extending the Longstop Date on March 17, 2011, from March 28, 2011 to July 26, 2011, (iii) making joint submissions with the BP Parties to the CNDC seeking governmental approval of the transaction on December 28, 2010, February 16, 2011, February 21, 2011, March 17, 2011, May 20, 2011 and July 20, 2011, (iv) stating on July 7, 2011 (and in subsequent discussions) that it "has been doing everything possible together with BP to obtain the necessary approvals from the CNDC to close this transaction," and  (v) agreeing to extend the Longstop Date to November 1, 2011 on July 21, 2011.   In short, Bridas's actions since December 21, 2010 were inconsistent with its position now that it was fraudulently induced into entering into the Share Purchase Agreement and related agreements and that the agreements and Releases are *void ab initio*.

## CAUSES OF ACTION

### COUNT ONE
### (For Declaratory Judgment Regarding the Share Purchase Agreement and AMI Waiver and Release)

62.     The BP Parties repeat and reallege each and every allegation in the preceding paragraphs as if fully set forth herein.

63.     The Share Purchase Agreement was a valid and legally binding contract and pursuant to its terms, certain provisions, including the AMI Waiver and Release therein, survive the termination of the Share Purchase Agreement and remain valid and legally binding provisions, enforceable in accordance with their terms.  Bridas has wrongly and unjustifiably claimed that the Share Purchase Agreement is *void ab initio* and thus that the AMI Waiver and Release is not effective and that the BP Parties remain bound by Sections 10.1 and 10.2 of the LLC Agreement.

64.     An actual case or controversy exists between the BP Parties and Bridas Parties as to whether the Share Purchase Agreement was *void ab initio*, whether the AMI Waiver and Release is now valid and enforceable according to its terms, and whether the BP Parties remain bound by Sections 10.1 and 10.2 of the LLC Agreement.

65.     Pursuant to 28 U.S.C. §§ 2201 and 2202, the BP Parties are entitled to a declaratory judgment that the Share Purchase Agreement is a valid and legally binding contract and the AMI Waiver and Release provided for therein is effective and enforceable in accordance with its terms.

## COUNT TWO
### (For Declaratory Judgment Regarding the Settlement Agreement and the Settlement Agreement Release)

66.     The BP Parties repeat and reallege each and every allegation in the preceding paragraphs as if fully set forth herein.

67.     The Settlement Agreement, including the Settlement Agreement Release provided for therein, is a valid and legally binding contract, enforceable in accordance with its terms. Bridas has wrongly and unjustifiably claimed that the Settlement Agreement is *void ab initio* and

threatened to assert claims against the BP Parties that have been released pursuant to Section 1(B) of the Settlement Agreement.

68.     An actual case or controversy exists between the BP Parties and Bridas Parties as to whether the Settlement Agreement was *void ab initio* and whether the Settlement Agreement Release is now valid and enforceable according to its terms.

69.     Pursuant to 28 U.S.C. §§ 2201 and 2202, the BP Parties are entitled to a declaratory judgment that the Settlement Agreement is a valid and legally binding contract and the Settlement Agreement Release provided for therein is effective and enforceable in accordance with its terms.

## PRAYER FOR RELIEF

WHEREFORE, the BP Parties request that the Court enter judgment against the Bridas Parties as follows:

(a)     declaring that the Share Purchase Agreement is a valid, enforceable and legally binding contract;

(b)     declaring that the AMI Waiver and Release set forth in Sections 6.8(a) and 8.2(e) of the Share Purchase Agreement is effective and, therefore, that the Bridas Parties have released the BP Parties from any obligations under Sections 10.1 and 10.2 of the LLC Agreement, effective as of January 1, 2010;

(c)     declaring that the Settlement Agreement is a valid, enforceable and legally binding contract;

(d)     declaring that the Settlement Agreement Release set forth in Section 1(B) of the Settlement Agreement is effective and enforceable in accordance with its terms;

(e)     alternatively, if the Court determines that the Share Purchase Agreement, Settlement Agreement and Releases are not valid and effective, declaring that Bridas is not entitled to the $700 million that it has requested from the BP Parties; and

(f)     granting the BP Parties such other and further relief, including costs and attorneys' fees, as this Court may deem just and proper.

Dated:  April  23, 2012          Respectfully submitted,

CADWALADER, WICKERSHAM & TAFT LLP
Gregory A. Markel
One World Financial Center
New York, NY 10281
Telephone:  (212) 504-6000
Facsimile:  (212) 504-6666
gregory.markel@cwt.com

*Attorneys for Plaintiffs BP Argentina Exploration
Company and
BP Alternative Energy North America Inc.*